May it please the Court, Counsel. I am pleased to be here today representing the appellant, Stevie Elliott. Do you need to identify yourself for the record? Yes. I am Don Harris. Pleased to be here today representing the appellant, Stevie Elliott. Ms. Elliott has appealed the district court's decision below that ERISA preempted her state law claims made pursuant to Montana's Unfair Trade Practices Act that basically prohibits insurance companies from engaging in unfair and deceptive claims adjusting practices, and that they did that in denying her claim. This Court should reverse the lower court for three reasons. First, ERISA's Savings Clause expressly saves from preemption state laws that regulate insurance. And given the United States Supreme... Greene says that this isn't such a law, though. Are you aware of that? Yes, I'm aware of that, Your Honor. And I think that Greene is no longer controlling in light of the Supreme Court's decision, both in Unum and also its most recent decision in Rush, because what they said in Rush was we have not decided this very issue that we are here today on. So I think that Greene is no longer controlling. In fact, I think that in light of the Supreme Court's earlier observations in Metropolitan v. Massachusetts and other decisions that laws that regulate claims adjusting practices are central not only to the business of insurance, which was the old test, but also to insurance practices. Second, in Rush, though, didn't the court say that under the Illinois law, they were seeking the same remedies under ERISA. Therefore, there was no preemption. I think the key. I think the key language in Rush, first of all, dealt with the. In Rush, there was no remedy in addition to the remedies that were being sought. That's correct. That was it. They pursued their ERISA remedies and they prevailed on that point. Yes. And we, Mrs. Elliott, did prevail on the issue. She's seeking something beyond ERISA here. Yes. Yes, she certainly is, Your Honor. And I think the key I want to go right to the preemption issue, because I think that's the implied preemption issue. And that is as is the district court below found and is argued in the appellee's brief is basically this. That is the civil enforcement provisions in ERISA in and of themselves have implied preemptive force. And I think that we know based on the statutory language, based on the Supreme Court's decision, early decision in franchise tax court, as well as the most recent rush decision, that that simply isn't true. Let me explain why. And the very key language in Rush after the Rush court found that they had not decided this very issue. This before this court now. Justice Souter honed in on when there would be implied preemption under the civil enforcement provision. And he said this. He said the conflict arises when the state remedy would significantly, significantly expand the scope of ultimate liability imposed upon employers, imposed upon employers by the ERISA scheme. And he and I'll quote the language exactly. He said, quote, Any such provision that is referring here to a provision that would significantly expand the scope on employers violates ERISA's policy of inducing employers to offer benefits by assuring a predictable set of liabilities under uniform standards of primary conduct in a uniform regime of ultimate remedial orders and awards when a violation has occurred. Now, this is critical. This is absolutely critical. If you look at the statutory language of ERISA, the civil remedies section appears 1130 to 29 U.S.C. 1132. It has no preemption language in any of the remedies itself. The first time you see preemption language is when you go down to 1144 A, which has the initial preemption language. But then the savings clause appears right under that. And here's what's critical. It says, except as provided in subparagraph B, nothing in this subchapter shall be construed. Now, the subchapter it's referring to is the very subchapter that contains 1132. So it says nothing in the subchapter, including 1132, which is the civil remedies section, shall be construed to exempt or relieve any person from any law of any state which regulates insurance, banking, banking and securities. And then even more critical at the end. And this is where we get to the McCarran Ferguson Act in the earlier Supreme Court decisions. It said, again, an independent round for saying that these Montana laws are not preempted. It says nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair or supersede any law of the United States, etc. And the key point there is, is that we know from the history of ERISA that the savings clause, both the savings clauses and the part that I just read, that the Supreme Court has recognized that it's there because of the McCarran Ferguson Act. Now, as the state of Montana amicus brief, I think eloquently states, if you take away Montana's right to provide a remedy for unfair and deceptive claims adjusting practices, then you have eviscerated and impaired Montana's prohibition against such practices. You have violated the McCarran Ferguson Act. How do we get to this point? Well, I do have to talk about pilot life because pilot life and then you and I think are critical to this, to this whole conundrum about implied preemption and pilot life. For the first time, the Supreme Court was interested in an argument, an argument made by the solicitor general that suggested that the civil enforcement proceedings were so broad in scope under ERISA, that the provisions were so broad that there was an independent ground of preemption. In fact, the solicitor general likened those ERISA remedies to what's available under the Labor Management Relations Act. And so we have a lot of dicta and it is just dicta in pilot life because remember, pilot life, that law was never saved from preemption to begin with. So they never had to get to the implied preemption argument. I just lost my train of thought, but I'll get it back. So they never had to get to the implied preemption argument. And then when Unum came, Unum very importantly said, wait a minute here. Don't take what we said in dicta in pilot life as applying to a Mississippi law. That's not specifically targeted to the insurance industry. It's just common law by faith. Don't take that out of context. And in fact, in Unum, they specifically noted in the footnote. In the footnote, they said they brought up the solicitor general's argument again and noted that the solicitor general was now arguing that if the state law that regulated insurance was saved from preemption, then so was its remedy. But in Unum, they didn't have to reach the issue because under the notice prejudice rule at stake there, there was no remedy, additional remedy sought. How else do we know that there's no implied preemption when the remedy is limited to the insurer as opposed to the employer? Well, it's the whole history of the McCarran-Ferguson Act. Under the McCarran-Ferguson Act, the Supreme Court has recognized that because of an earlier Supreme Court decision, Congress immediately passed that act to ensure that states could continue to regulate the business of insurance. There's no question that Montana's statutes that the lower court held were preempted were passed pursuant to the McCarran-Ferguson Act. No question about that issue. The private right of action is that a regulatory measure in the sense that pilot life use the term. Is that is that regulatory? Does that empower the state to regulate insurance companies in some way? It's a private right of action, isn't it? Well, actually, the state of Montana can enforce the regulations prohibiting unfair and deceptive practices if they can prove a general practice. The state of Montana also gave individuals like Miss Elliott a right to see compensatory and punitive damages, not and we have not sought for the benefits under the policy, but for the separate wrongs created and the harm inflicted by unfair and deceptive practices. This is a provision for punitive damages. Doesn't that violate the principle in Rush? They shouldn't shouldn't allow remedies in excess of what's allowed by RISA. And here is where the distinction is so important between the insurer and the employer. Remember, the purpose of your RISA was to do two things. It was to encourage employers to adopt pension plans and welfare benefit plans. The other purpose was to protect the beneficiaries interest in benefits under those plans. What the Supreme Court has said is that if the remedy against the employer is already present, it's already present in the civil enforcement provisions. If it's already there, it cannot be duplicated by the state. There is preemption as to that. But they have never held, never held that for the remedy is against the insurer that it would rampant. And it's a matter of common sense. We know that couldn't be right. Let me give you give you an example. All right. Seems to me punitive damages violate the principle of Rush. How do you deal with that? You quoted some language from Justice Souter earlier. Yes. What the rationale of all this was, isn't that violated by allowing a recovery of punitive damages? No, I don't believe so. And this is why. Remember, from an employee, I'm an employer. We provide group benefits to our employees. Does it further your risk for a state to have a law that says you can't engage in unfair and deceptive claim practices to deny a claim? Well, from an employer standpoint, of course it does. Why? Because I know that the money that I have paid to offer in premiums for benefits for my employees isn't illusory. That when my employees go to make a claim, they're going to be treated fairly. So this law furthers my incentive, if you would call it, to provide such benefits. What if the converse is true? And remember, although your risk heavily regulates pension plans, as the court in Metropolitan recognized, it does not regulate welfare benefit plans. There is no regulation. Why? Because that's reserved to the states. Therefore, if there is no remedy, if there is no remedy prohibiting unfair and deceptive trade practices in adjusting claims, what is to prevent infratures from doing exactly what they did in this case? They can do it with impunity, which would subvert the very intent of ERISA to protect people like Stevie Elliott's right to benefits that her employer has paid for. Counsel, what does the Kentucky Association case bring to this puzzle? I think it clearly removes any discussion about whether or not this is a statute that regulates insurance. The test, the new test under Kentucky is whether the law is specifically directed toward entities engaged in insurance. And two, whether the state law substantially affects risk pooling arrangements between the insured and insurer. In the Kentucky case, the court recognized that this is decision in UNAM involving the notice prejudice rule. Affected the risk pooling arrangement between insurer and insured. And the reason it did that, the court said, is because the notice prejudice rule dictates the conditions under which the insurance company must pay a risk that pay for a risk that is already assumed. So how does the risk pooling issue affect this case? Yeah. The Montana Statute 3318 201 and the Supreme Court decisions interpreting that. And there are four of them now. Ridley, I cited them in the brief. They're Ridley, Waters, DuBray, and the most recent one, Shulhannock. Affects the risk pooling arrangement much in the same way that the notice prejudice rule does it. It tells the insurance insurers that they cannot wait to pay until a judgment has been entered against the insured. In other words, they have to pay before the indemnity provision of the contract. It tells them that they have to advance pay medical bills, wages. And in fact, under the Shulhannock decision, what it says is that they have to advance pay policy limits in cases where liability is reasonably clear and cannot even ask for a release. So but it does much more than the than the notice prejudice rule ever did. These statutes affect the risk pooling arrangements. And keep in mind, risk pooling. The Supreme Court said in Kentucky is much different than risk spreading. So you no longer have to show risk spreading anymore. It's just whether it affects the risk pooling arrangements. But quite frankly, and I would invite the court to read the dissent in and the case of the United Labor Life Insurance Company versus Prino, because the dissent in that case eloquently states why claims adjusting practices are central, absolutely central to insurance practices in the business of insurance. And it's a point in which the majority agreed the dispute in Prino was whether or not independent chiropractic review boards. So in a sense, you assert the claims adjusting practices, whether that would be the business of insurance. And while the majority in dissent disagreed over whether that particular chiropractic review board did that, they absolutely agreed that claim adjusting practices are central to the business of insurance. I'll see you down to about three minutes. Do you wish to say? I would like to say, but your honor, thank you. Mr. Stirrup. Thank you. May it please the court. Counsel. My name is Rod Stirrup. I'm here representing Forest Benefits. The lower court determined that Montana's insurer bad faith claims are preempted by ERISA. That decision should be affirmed. This court has so held on many occasions, including cases decided under the Montana statute at issue here. The Supreme Court has so held, including pilot life, a decision that was reaffirmed vigorously both in 1992 in Rush and recently in the Miller decision. In briefing below the Kentucky Association versus Miller. In briefing below, the plaintiff relied upon anomalous district court decisions in the months immediately following Ward, concluding that Ward in a particular footnote. Exactly. We use the same term. Thereafter is Unum and Kentucky in Unum footnote seven. The number of district courts anomalously had concluded that that opened the door to bad faith claims that has now been rejected by every circuit that is considered the issue. There are a number of reasons why the district court decision should be affirmed. I'd like to focus on three. First, these state law claims unquestionably relate to ERISA and therefore are within the scope of the express preemption clause. Secondly, they are not within the scope of the savings clause since they do not affect substantially or otherwise the risk pooling arrangement. And thirdly, even if they were within the scope of the savings clause, they are subject to conflict preemption. Well, now, where does what's your view of Greary at this case? What is your view of Greary at this stage? Greany continues to control. In that case, this court determined that claims under the Montana Unfair Trade Practices Act do not regulate insurance, citing and relying upon pilot life and the analysis of pilot life. That decision parallels a more recent decision, the November 2002 decision of this court in Botsford. Botsford was a FEBA case, not an ERISA case. Nonetheless, this court looked to and applied ERISA preemption principles in determining the claims under the Unfair Trade Practices Act are preemptive. Greany seems to say that the Montana statute is not regulating insurance because it's a civil enforcement provision. Is that correct? Do I understand Greany to have made that? I believe you have correctly paraphrased the court's opinion. And the court in Greany cited pilot life and pilot life. There was a determination that state law, bad faith claims do not regulate insurance under the McCarran-Ferguson test, and also that they are subject to conflict preemption because they provide an alternative civil enforcement mechanism. Of course, that proposition has never been affirmed by the Supreme Court. You're talking about independent preemption based on the civil enforcement provision. Indeed. The Supreme Court has steered clear of that one, though, I don't think. Well, as Your Honor correctly pointed out in questioning the counsel in Rush, the court indicated emphatically that that remained a factor that was very important to its analysis. The Illinois statute in that case was saved from preemption because it did not invoke alternative enforcement remedies. The majority took pains to point that out. And in fact, the majority characterized this conflict preemption doctrine of pilot life as a categorical bar. So I think it is difficult to conclude that the pilot life rationale has been questioned. In fact, it's been dramatically affirmed in subsequent Supreme Court decisions. The punitive damage issue, is that basically what might make this provision preemptive under what's the last case we're talking about? The Illinois HMO case.  Indeed. Indeed, the Montana statute provides civil enforcement mechanisms that do not exist in ERISA. As the Seventh Circuit stated in Bassler, a decision written by Your Honor, the silence of Congress on that point is deafening. Where Congress implements a comprehensive civil enforcement scheme, as it most assuredly did in ERISA, but elects not to include certain remedies such as extra contractual damages and punitive damages, then necessarily that means Congress made a decision not to provide those remedies into ERISA. Importing those remedies into ERISA through state laws and state remedies would undermine congressional purpose. As stated in pilot life, there was a careful balancing by Congress. Congress, with this civil enforcement scheme, balanced the interests and came up with the remedies, and the only remedies, the exclusive remedies that could arise under ERISA. That was the law in pilot life. It was the law in Rush. And it was the law in Kentucky. I would refer in addition to this Court's November 2002 decision in N. Gay-Bua, 310 F. 3rd, 1143. This Court stated, if a claim alleges a denial of benefits, ERISA preempts it. A denial of benefits involves an administrative decision regarding coverage. Under any of the tests for determining ERISA's preemption applied by this Court, it is clear that ERISA preempts suits based on administrative decisions. Certainly, as this Court pointed out in Rutledge, there have been a number of tests that have been used by this Court. But as this Court has also made clear, under any test, doesn't matter which one you use, if the dispute arises from a claim and a dispute over claim, it is within the scope of ERISA preemption. Indeed, that was categorized in MetLife as one of the traditional areas of ERISA preemption that really has never been subject to any reasonable dispute. What about the distinction between the employer and the insurer? That distinction is one that fails to find any traction in any case law, either of this Court or of the Supreme Court. I was looking through some of the decisions of this Court in the insurer bad-faith arena, also the pilot-like decision, and also in some post-war decisions of the other circuits, Conover, Moffitt, Walker, Gilbert, and Howard, among the others that we cited in our brief. And obviously, in these cases, employers and insurers are sued, depending upon the fact pattern. And I prepared a spreadsheet with five columns identifying the tests the courts have looked to. Is it specifically directed, the three McCarran-Ferguson factors, and then finally, the alternative enforcement or conflict preemption? And I looked to see if there was any showing that where the insurer is the defendant rather than employer, the courts have drawn a different conclusion. And the answer is no, uniformly. Whether it's the employer, whether it's the insurer, the court applies the same test to the same laws and reaches the same conclusion, these sorts of unfair claims practices or bad-faith claims are preempted. I think it's also worth pointing out that the Savings Clause itself obviously is directed to insurers. The Savings Clause applies to State laws that regulate insurance. Now, if insurers were not subject to the iris of preemption in the first place, there would be no need for the Savings Clause to take insurance laws out of the scope of iris of preemption. So this dichotomy between employers and insurers is one that has never been recognized by any court and that simply does not exist. In Botsford, the November 2002 decision arising under the Montana statute, this court made two very important points. First, application of different State standards would disrupt the nationally uniform administration of benefits and would undermine congressional intent. Second, although Botsford stated his claim as one for breach of State law, as the plaintiff did here, it really amounted to an alternative way of remedying a contract breach. And because the case was a dispute over benefits, conflict preemption applied. If Ward had affected a C change, this Court would have said so in Botsford, in N.J. Bua and other cases. It has not done so. The other circuits routinely have rejected this argument, and the ruling of the district court should be affirmed on that basis. Now, that brings me to last month's decision in Kentucky Physicians. Roberts. Excuse me, counsel. You referred to the N.J. Bua case. Is that in the briefs? It is not, Your Honor. It is one that I have come across in endeavoring to respond to Kentucky versus. All right. For the convenience of the panel and opposing counsel, would you fill out one of our citation forms in triplicate, I guess, and before you leave today. Indeed, I'd be happy to do so. Kentucky was not the first post-war decision to address the risk of preemption. Of course, Rush Prudential versus Moran was a June 2002 decision. And as Judge Fedehe pointed out, in Rush the court explained that the Illinois statute was safe from preemption because, quote, this case does not involve the sort of additional claim or remedy exemplified in pilot life. In addition, the Rush court stated, and I quote, the procedure provided by the Illinois statute does not fall within pilot life's categorical preemption, a very strong affirmation of the pilot life principle. Now, if we turn to Miller, we'll see that, again, pilot life and the pilot life principles are reaffirmed. It's worth noting that in the very first analytical paragraph of the Kentucky decision, Justice Scalia cited three prior Supreme Court decisions. The first was pilot life. Later in the opinion, in explaining why the McCarran-Ferguson factors are no longer useful, the court explained that we really never have applied those as a fundamental or essential part of the test. They are mere guideposts or checking points. And, again, the court cited pilot life. Finally, in the last and most importantly the last paragraph of the opinion, in enunciating this new two-part test, the court cited most prominently its pilot life decision. The first prong of the new Miller test is whether the state law is specifically directed at the insurance industry. That enunciation of the test is followed by a citation to pilot life at page 50, as well as to Unum and to Rush. If we turn to pilot life at page 50, we will see that, indeed, that is where the Supreme Court enunciated this specifically directed test. In the very next sentence, in pilot life, the Supreme Court stated insurer bad faith laws are not specifically directed at the insurance industry. Although they have been directed to the industry in the case of the Mississippi case, nonetheless, they have their roots firmly in the common law and, therefore, do not satisfy that element of the test. So, clearly, the pilot life rationale, which in turn was the rationale for Greeney, is carried forward into the Kentucky test. The second leg of the Kentucky test is that there must be a substantial effect on the risk pooling arrangement. Now, that was, of course, the first McCarrison-Ferguson factor. Again, this question, in the case of insurer bad faith statutes, has been asked and has been answered by the United States Supreme Court. In pilot life, the Supreme Court expressly found that insurer bad faith claims do not affect risk pooling. These sorts of statutes do not define the terms of the relationship between the insurer and the insured. It declares only that whatever terms may have been agreed upon, a breach of that contract may, in certain circumstances, allow the policyholder to obtain punitive damages. Now, these principles were the source of this Court's decision rejecting insurer bad faith claims in Greeney, in Bast, in Tingey, and in the other cases. They are carried forward in Miller. And, indeed, that has been recognized by the one federal court case that has construed the new Miller test. That is McGuigan from the East District of Pennsylvania. Applying the two-part Miller test, the McGuigan court held that statutory insurer bad faith claims are not saved from preemption because they do not substantially affect the risk pooling arrangement. And also can be a lot of controversial differences in these opinions about what what affects risk pooling and what doesn't. What was it? One of them said something about the notice prejudice rule affects risk risk pooling. I believe it might it might affect it or something. I'm not sure what I understand. What affects this pooling? What doesn't? It's fair to say, as this court stated in Rutledge, that a risk of preemption is a veritable sargasso sea of obfuscation. Citing, I believe, a Third Circuit opinion. The risk pooling factor comes into play primarily because the savings clause is directed to laws that regulate insurance. A risk that doesn't define regulate, it doesn't define insurance. The Supreme Court, therefore, in the decisions dating back to Royal Drug, has stated the hallmark of insurance is risk pooling. That's what differentiates insurance from something else. And so under the McCarran-Ferguson test, that was a critical feature. And it's carried forward into the Miller test. In Cisneros, which was and became the Union Supreme Court decision, this court held, well, the notice prejudice rule doesn't affect, doesn't spread risk. Nevertheless, the two other factors are satisfied. And so the notice prejudice rule is safe from preemption. And the Supreme Court in Unum dodged the issue by saying, the lower court, the Ninth Circuit, found it doesn't spread risk. We see an argument that it does. We don't have to decide that because two of the three factors are clearly satisfied. In Kentucky, Justice Scalia took pains to point out, both in the text and in the footnote, that, in fact, the notice prejudice rule did substantially affect the risk pooling arrangement. And he pointed out the fashion in which it did. And I would submit that the reason for that is that Justice Scalia wanted to make clear that Kentucky does not enunciate a new standard that rejects, implicitly or otherwise, the prior Supreme Court decisions on the risk of preemption. One could have argued that, based upon the new test, and because substantial effect on risk pooling is now a mandated element, not merely one of three discretionary elements. That's now a mandated element. One could have argued that Unum was wrongly decided. Justice Scalia pointed out, not the case. Because if you look at our decisions, although we use the formulation from McCarran-Ferguson of spreading risk, what we really were holding was, does it have a substantial effect on risk? Unum illustrates that. And Unum shows that, in fact, under our test, this law still would have been preempted. A long way of saying that, yes, there is some confusion. But contrary to the plaintiff's claims, this new decision, the Kentucky decision, does not announce any sort of a rejection of prior Supreme Court case law. Throughout the Kentucky decision, at no point anywhere does Justice Scalia ever say that any of the prior decisions were wrongly decided. That includes pilot life. It includes Unum. It includes rush prevention. Unum said they shifted the risk of stale evidence or something to that effect. I don't recall a risk. This is some kind of a risk that would not have occurred to me. There was a confusing discussion, which this Court held one way. The Supreme Court dodged the issue. And ultimately, it was not dispositive in that case. I want to address very briefly the Montana Supreme Court decisions on which the plaintiff has relied. In a March 2002 decision, this Court has noted that ERISA preemption derives from the Federal Supremacy Clause. It is a Federal law issue, not a State law issue. The cases cited by the plaintiff under State law are not ERISA cases. There is no discussion of the ERISA statute. There is no discussion of the Supreme Court decisions or this Court's decisions construing that statute. They are not precedential authority, and they are not even persuasive authority. The touchstone is congressional purpose. As noted by the Supreme Court in Egelhoff, State law is preempted where it interferes with a nationally uniform plan of administration. And as held in Ingersoll Rand, the purpose of preemption was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government. Otherwise, the inefficiencies created could work to the detriment of plan beneficiaries. These principles continue to hold sway. As I understand, the plaintiff did recover her benefits under ERISA, is that right? Indeed. The plaintiff asserted State law claims. The district court corrected that. Is that significant? I don't know, in these other cases, whether there was a parallel ERISA claim that succeeded or not. I don't know whether that has anything to do with it. Well, I think absolutely it's significant because it shows that ERISA more than adequately addressed the claims-benefit dispute that was at issue here. The plaintiff claimed, you denied my claim for benefits. You shouldn't have done that. ERISA provides a mechanism for redressing that. That mechanism was utilized here, and the district court determined, applying an abusive discretion standard, that indeed the claim should have been paid, and we have elected not to appeal that. So does ERISA provide a comprehensive civil enforcement mechanism? It sure does. Does it work? It does. It's illustrated by this case. Are plaintiffs allowed to resort to State law mechanisms to supplement or add to those ERISA remedies? No. Categorically, no. That is the categorical preemption bar of pilot life of rush prudential as repeatedly affirmed by the United States Supreme Court. In summary, the State law claims asserted by the plaintiff were and always have been subject to preemption, categorical preemption under ERISA. The district court correctly granted summary judgment that ruling should be affirmed. Thank you, counsel. Mr. Harris, you have some reserve time. Thank you. Just a couple of things. It's very important that the Court read and consider Franchise Tax Court, because in that case, which dealt with the well-pleaded complaint rule, the Court basically decided that since 502, the exclusive remedy or the civil remedies provisions of ERISA, did not fully preempt State law claims relating to ERISA plans, that the case was improperly removed and had to be remanded. In fact, the Court said this. The Savings Clause of ERISA, quote, makes clear that Congress did not intend to preempt every State cause of action relating to such laws, that is, ERISA laws. It is critical. Which case are you referring to? This is Franchise Tax Court v. Construction Laborers, Your Honor. It's very critical. The other thing is, look what's happened here with this argument. The insurance companies have essentially piggybacked themselves onto employers to argue that they can't be held liable for unfair and deceptive trade practices. In fact, the argument goes like this. Let me give you an analogy, because I think it shows the separate harm that Montana's laws are designed to stop. Somebody comes into my house and steals something from me. After a year or so, through a court proceeding, I prove that they took my property. And then they say, if I just give your property back to you, let's call it square. Is that what's going to happen here? I mean, that is exactly what happens here if States aren't designed to stop unfair and deceptive trade practices. Remember that in risk pooling, my goodness, the insurance companies, when they engage in these practices, basically are denying claims for which premiums have been paid. Does it affect risk pooling? Sure. The insurance company isn't paying for claims that it has said it would insure. So what happens here under this argument, under the guise of ERISA, is that insurance companies, insofar as they insure group plans, are not regulated by anything that prohibits them from engaging in lying and deception and dishonesty and the like. How does that encourage an employer to offer a group plan? In fact, what you have now in this country are two different sets of standards for insurance companies. If I go by my plan, they have to comply with laws that prevent them from being dishonest. But if my employer provides it for me, they can engage in such tactics. And if they finally get caught, which they did in this case, they say everything is made good if we just give the money back. That is not what ERISA intended. Thank you, counsel. Let me indicate for the benefit of both counsel that we still have this matter of whether we're going to have supplemental briefing on the Kentucky case. If the panel feels we need it, we will ask for it by subsequent order. Thank you very much. The case just argued will be submitted for decision.
judges: Cudahy , O'scannlain, Gould